PUBLISH

UNITED STATES COURT OF APPEALS

**Filed 8/26/96**TENTH CIRCUIT

---

LENNON H. MACDONALD,

     Plaintiff-Appellant,

v.

DELTA AIR LINES, INC., a Delaware
corporation, and DELTA FAMILY CARE
RETIREMENT PLAN,

     Defendants-Appellees.

No. 95-4098

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. D.C. 94-CV-287B)

---

John Preston Creer, Salt Lake City, Utah, for Plaintiff-Appellant.

Chris Wangsgard, Parsons Behle & Latimer, Salt Lake City, Utah, for Defendants-
Appellees.

---

Before EBEL, KELLY, and HENRY, Circuit Judges.

---

HENRY, Circuit Judge.

---

     Plaintiff Lennon H. MacDonald appeals the district court's grant of the summary

judgment motion of defendants Delta Air Lines, Inc, and Delta Family Care Retirement

Plan on his age discrimination and disability discrimination claims. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I. BACKGROUND

The following are the undisputed facts in this case as set forth by the district court: Mr. MacDonald had been an airplane mechanic for Western Air Lines ("Western") for eighteen years when Western merged with Delta Air Lines ("Delta"). After the merger, he became a Delta mechanic on April 1, 1987. His duties as an aircraft mechanic included meeting arriving flights, checking with the crew to identify any mechanical problems, and preparing flights for timely departure.

As part of his duties in meeting arriving aircraft, Mr. MacDonald was assigned to an arrival gate in accordance with a schedule which was posted each morning on a mechanics' bulletin board. Under Delta's written policy, mechanics, including Mr. MacDonald, should be at the arrival gate five minutes before a flight arrived. If the aircraft crew had some mechanical problem to report, the assigned mechanic would correct the mechanical problem, if possible, before the plane took off. Additionally, the mechanic had the responsibility of visually inspecting the aircraft to detect possible mechanical problems and of determining if a flight should be delayed to repair mechanical malfunctions. After making a repair, the mechanic would document the repair in the computer log. Performance of these duties required fifteen to thirty minutes, even if the plane had no mechanical problems to report.

2

On June 29, 1993, Mr. Joseph F. Froehlich, Delta's general foreman of maintenance for Salt Lake City and the associated regional area, was observing operations at the D Concourse of the Salt Lake City Airport. At about 10:00 a.m., Mr. Froehlich noticed that Delta Flight 443 had arrived at Gate D3 and that no mechanic was present to meet the flight. Mr. Froehlich then walked down to the D Gate ready room, seeking an explanation for the absence of a mechanic at Gate D3. As he entered the room, he saw Mr. MacDonald sitting in the break area reading a newspaper or magazine. Mr. Froehlich went to the foreman's office and advised foreman Mark Werner that no mechanic was present at Gate D3. Mr. Werner investigated this report and discovered that Mr. MacDonald was the mechanic assigned to Flight 443. He located Mr. MacDonald in the break room reading a newspaper and told him to go work his assigned flight.

The next day, June 30, 1993, Mr. Froehlich called Mr. MacDonald into his office and asked him to write an incident report explaining why he did not meet Flight 443. Mr. MacDonald complied and submitted a report in which he indicated that he did not meet the flight due to an oversight of time on his part. After reviewing the incident report, Mr. Froehlich informed Mr. MacDonald that his reason was unacceptable. Mr. Froehlich then suspended Mr. MacDonald from employment pending further investigation, based on his failure to meet the flight and on his prior poor work performance.

Mr. Froehlich subsequently recommended that Delta terminate Mr. MacDonald's employment. On July 2, 1993, Mr. Ernie Menet, the Delta aircraft maintenance manager,

submitted a written memorandum recommending that Mr. MacDonald be terminated based on his failure to meet the flight and on prior disciplinary problems. Delta management accepted this recommendation. On July 20, 1993, Delta offered Mr. MacDonald the choice of resigning or of being terminated. He subsequently resigned at age fifty-two.

## II. DISCUSSION

We review de novo the district court's grant of summary judgment, applying the same standard as did the district court. E.g., Jones v. Unisys Corp., 54 F.3d 624, 627 (10th Cir. 1995). Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A fact is 'material' only if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Thomas v. IBM, 48 F.3d 478, 486 (10th Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). We view the evidence and draw any inferences therefrom in the light most favorable to the party opposing summary judgment, here Mr. MacDonald. Id. at 484.

Mr. MacDonald claims that Delta fired him in violation of both the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634, and the Americans

with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213.  However, because Mr. MacDonald has failed to establish a prima facie case under either act, meaning that no reasonable jury could return a verdict in his favor, we uphold the district court's grant of summary judgment to the defendants on both claims.

### A.  The Age Discrimination Claim

Under the ADEA, an employer cannot "discharge any individual . . . because of such individual's age."  See 29 U.S.C. § 623(a)(1).  Thus, for Mr. MacDonald to establish a claim under the ADEA, he must show that Delta's decision to fire him was motivated, at least in part, see James v. Sears, Roebuck & Co., 21 F.3d 989, 992 (10th Cir. 1994) (explaining that the plaintiff is not required to show that the employer was motivated only by the plaintiff's age), by his age.  See, e.g., Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993); Jones, 54 F.3d at 630; Thomas, 48 F.3d at 484.  There are two methods for showing that an ADEA defendant held the requisite discriminatory intent.  First, the plaintiff may present direct proof of the defendant's discriminatory intent.  Mr. MacDonald has offered no direct evidence showing that Delta fired him because of his age; therefore, he must proceed in the second manner, by presenting circumstantial evidence that indirectly proves Delta's discriminatory motive in firing him, see Jones, 54 F.3d at 630; Thomas, 48 F.3d at 484.

Where an ADEA plaintiff presents only circumstantial evidence of discrimination, we apply the analysis outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-

02 (1973) (a Title VII case). See, e.g., Jones, 54 F.3d at 630; Thomas, 48 F.3d at 484.

For a plaintiff-employee to establish a prima facie case of age discrimination, the McDonnell Douglas analysis requires a showing that "(1) the employee belongs to the protected age group; (2) the employee's job performance was satisfactory; (3) the employee was discharged; and (4) the employee was replaced by a younger person." Thomas, 48 F.3d at 484.

### 1. The Establishment of the First Three Elements of the ADEA Claim

The parties do not dispute that Mr. MacDonald has established the first and third elements of a prima facie case under the ADEA. When Delta forced him to resign, effectively firing him, he was fifty-two, bringing him within the ADEA's protected class of individuals, those "who are at least 40 years of age," 29 U.S.C. § 631(a).

As to the second element, the defendants argue that Mr. MacDonald has not shown that his "job performance was satisfactory" in light of his past adverse employee evaluations and his failure to meet his assigned flight on June 29, 1993. See Thomas, 48 F.3d at 484. However, we conclude that there is sufficient evidence in the record to create a genuine issue of material fact as to whether Mr. MacDonald was a satisfactory airplane mechanic. This evidence includes the following: On March 5, 1993, four months before Mr. MacDonald's termination, Mr. Larry Rogers, who was Mr. MacDonald's supervisor at the time, completed a personnel evaluation of Mr. MacDonald. See Aplt's App., Ex. D at 83. In all categories evaluated, he gave Mr. MacDonald a rating of

"standard." Id. He stated that Mr. MacDonald "continue[d] to improve in his use of the computer system and the tech manuals. . . [and] continue[d] to make the effort to improve from the below standard rating he was given." Id. at 84. Mr. Rogers recommended that Mr. MacDonald "be taken off the monthly evaluation list," describing Mr. MacDonald as "dependable, cooperative and always willing to help out when asked." Id.

In addition to Mr. Rogers's "standard" evaluation, the evidence regarding the frequency of a mechanic missing an assigned flight and the punishment imposed for doing so shows that a reasonable jury could conclude that, despite missing his assigned flight, Mr. MacDonald was a satisfactory airplane mechanic. Mr. Mark Werner, a Delta foreman at the Salt Lake City airport, testified in his deposition that occasionally "there is an airplane that arrives and a mechanic isn't there to start his work on it." See Aple's Supp. App., Ex. F at 233. Both he and Mr. Tom Orges, a Delta supervisor, testified in their depositions that they were unaware of any employee, other than Mr. MacDonald, having been fired for missing an assigned flight. See id. at 238-39; Aple's Supp. App., Ex. E at 228-29. Further, Mr. MacDonald stated in his affidavit that he had "never been written up for missing an airplane in 24 years and 5 months of service with Western and Delta Air Lines, except for the one incident on June 29, 1993." See Aplt's App., Ex. H at 199. Taken together and viewed in the light most favorable to Mr. MacDonald, this evidence shows that he was fired for an incident of unsatisfactory performance that had previously been committed by others who did not suffer similar punishment. This

7

evidence in sum might lead a reasonable jury to conclude that Mr. MacDonald was a satisfactory airplane mechanic, establishing the second element of his ADEA claim for purposes of summary judgment.

## 2. The Failure to Establish the Fourth Element, Replacement by a Younger Person

Mr. MacDonald has not, however, established the fourth element of a prima facie case under the ADEA, that he "was replaced by a younger person," Thomas, 48 F.3d at 484. In an attempt to establish this element, Mr. MacDonald argues that he was replaced by Mr. John R. Brzenk. The parties do not dispute that Mr. Brzenk is younger than Mr. MacDonald. Their dispute focuses on whether Mr. Brzenk replaced Mr. MacDonald after Delta fired him.

The uncontradicted evidence establishes that Mr. Brzenk was originally assigned as a mechanic in department 250, Mr. MacDonald's department. Aplt's App., Ex. J at 207. He was then temporarily assigned to work as a training instructor on a project involving Delta 737 aircraft. Id. During this temporary assignment, he was no longer paid by department 250, but was instead on the payroll of the department that paid the training instructors working on the 737 project. Id. When Mr. Brzenk's temporary assignment ended, he returned, once again as a mechanic, to department 250. Id.

Mr. MacDonald asserts that in transferring Mr. Brzenk back to his position as a mechanic in department 250, Delta replaced him with Mr. Brzenk. If in fact Mr. Brzenk were transferred in order to replace Mr. MacDonald, this would be true. However, Mr.

8

Orges's uncontradicted deposition testimony establishes that Mr. Brzenk "always was in department 250," see id., and was not transferred to department 250 in order to replace Mr. MacDonald.

Mr. Orges testified in his deposition that Mr. Brzenk's assignment as a training instructor was "a temporary situation." Id. That assignment was originally for "approximately 18 months," id. at 208, and was only shortened by Delta's decision to sell the fleet of 737's for which Mr. Brzenk was training people, id. at 207-08, causing Mr. Brzenk's return to Mr. MacDonald's department to coincide with the timing of Mr. MacDonald's termination. Mr. Orges testified that when Mr. Brzenk accepted the temporary assignment as a training instructor, he was "told . . . that once his stint of 18 months is up, that he goes back to his same position." Id. at 208. Finally, Mr. Orges testified that even while Mr. Brzenk was on temporary assignment and on another department's payroll, he was still included in the total number of mechanics allotted to department 250. Id.

In addition to Mr. Orges's deposition testimony, exhibits attached to the affidavit of Mr. Joseph F. Froehlich, Delta's general foreman of maintenance for the regional area including Salt Lake City, indicated that Mr. Brzenk was always considered one of the mechanics assigned to department 250. See Aplt's App., Ex. M. The first exhibit, a report made on June 18, 1993, two days before Mr. MacDonald was fired, lists Mr. Brzenk as a mechanic assigned to department 250. See id. at 219. In a subsequent report,

9

made on November 2, 1993, Mr. Brzenk was still listed as a mechanic assigned to department 250. See id. at 224. These reports demonstrate that Mr. Brzenk was considered a mechanic with department 250, both before and after Delta fired Mr. MacDonald, meaning that Mr. Brzenk did not replace him.

Not only do these reports indicate that Mr. Brzenk did not replace Mr. MacDonald, they show that no one replaced him. They state that as of June 18, 1993, two days before Mr. MacDonald was fired, department 250 was approved to have 116 mechanics, but was assigned only 110. See id. at 218. As of November 2, 1993, the department was still approved to have 116 mechanics, but the number assigned to it had reduced to 103. Id. at 223. As the district court noted, this decrease in the number of mechanics in the department indicates that Mr. MacDonald was not replaced by anyone, younger or older.[1] Based on this uncontradicted evidence, a reasonable jury could not conclude that Mr. Brzenk replaced Mr. MacDonald. See Anderson, 477 U.S. at 248; Thomas, 48 F.3d at 486. Therefore, he has not established the fourth element of his prima facie case under the ADEA. For this reason, we affirm the district court's grant of the defendants' motion for summary judgment on this claim.

---

[1]Mr. MacDonald does not argue that this reduction in assigned mechanics in department 250 reflects that Delta was reducing its workforce. See Aplt's Br. at 9. Had he instead argued and established that the decrease in mechanics was part of a reduction in Delta's workforce, he would have needed to demonstrate the fourth element under McDonnell Douglas "by producing 'evidence, circumstantial or direct, from which a fact-finder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.'" Jones, 54 F.3d at 630 (quoting Branson v. Price River Coal Co., 853 F.2d 768, 771 (10th Cir. 1988)).

## B. The Disability Discrimination Claim

In addition to his claim that he was fired because of his age, Mr. MacDonald asserts that Delta fired him because of a disability he had under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213.  Specifically, he claims that Delta's knowledge of his vision problems caused Delta to regard him as having "a physical . . . impairment that substantially limit[ed]" his ability to perform the duties of an airplane mechanic.  See 42 U.S.C. § 12102(2)(A), (C).

The ADA prohibits a "covered entity" from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees."  See 42 U.S.C. § 12112(a).  The Act defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  See 42 U.S.C § 12111(8).  Thus, to establish a prima facie case under the ADA, Mr. MacDonald must establish "(1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that the employer terminated him because of his disability."  See White v. York Int'l Corp., 45 F.3d 357, 360-61 (10th Cir. 1995), quoted in Milton v. Scrivner, Inc., 53 F.3d 1118, 1123 (10th Cir. 1995).  Mr. MacDonald has failed to establish the first and third elements of an ADA claim.

11

## 1. Failure to Establish a Disability Under the ADA

The ADA defines a "disability . . . with respect to an individual" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Mr. MacDonald relies upon subsection (C) of § 12102(2) in an effort to establish that he was disabled under the ADA. Subsection (C)'s description of "such an impairment" refers to subsection (A)'s definition of the type of impairment required under the ADA. Thus, under subsection (C), a person is disabled under the ADA if he is "regarded as having," 42 U.S.C. § 12102(2)(C), "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," 42 U.S.C. § 12102(2)(A), regardless of whether he actually has such an impairment, see Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 727 (5th Cir. 1995) (holding that the plaintiff "might have qualified as disabled under the ADA if she could have provided sufficient summary judgment evidence that she was regarded by [the defendant] as having an impairment that substantially limited a major life activity, whether she actually had such an impairment or not" (emphasis added)).

To determine whether Mr. MacDonald has satisfied § 12102(2)(C)'s definition of a disability, thereby establishing the first element of his ADA claim, we must define three terms that, by reference to § 12102(2)(A), are included in the definition: "regarded as," "major life activities," and "substantially limits." The ADA does not define these terms.

12

For this reason, we have previously referred to the Act's implementing regulations, see 29 C.F.R. Pt. 1630, for clarification. See Bolton v. Scrivner, Inc., 36 F.3d 939, 942 (10th Cir. 1994), cert. denied, 115 S. Ct. 1104 (1995).

### (i) "Regarded As"

The regulations implementing the ADEA explain that a person is regarded as having an impairment that substantially limits a major life activity if he

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) Has none of the impairments defined in [29 C.F.R. § 1630.2(h)[2]] but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(l)(1)-(3) (emphasis added). Thus, "[a] person is 'regarded as having' an impairment that substantially limits the person's major life activities when other people treat that person as having a substantially limiting impairment. The focus is on the impairment's effect upon the attitudes of others." Wooten v. Farmland Foods, 58 F.3d 382, 385 (8th Cir. 1995) (citation omitted).

### (ii) "Major Life Activities"

In order to evaluate Mr. MacDonald's assertion that he is disabled under the ADA,

---

[2]Section 1630.2(h) defines "physical or mental impairment" as used in 42 U.S.C. § 12102(2).

the second term from § 12102(2) that must be defined is that which Delta must have perceived as being substantially limited by his impaired vision: "major life activities." See 42 U.S.C. § 12102(2)(A), incorporated in 42 U.S.C. § 12102(2)(C). The ADA's implementing regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." See 29 C.F.R. § 1630.2(i) (emphasis added). Mr. MacDonald claims that Delta perceived his vision problems as substantially limiting the "major life activit[y]" of "working." See id.

### (iii) "Substantially Limits"

The final aspect of the ADA's definition of a disability under 42 U.S.C. § 12102(2)(C) that requires explanation is the requirement that the impairment at issue be perceived as "substantially limit[ing]" a major life activity. See 42 U.S.C. § 12102(2)(A), incorporated in 42 U.S.C. § 12102(2)(C). The regulations implementing the ADA list three factors that "should be considered in determining whether an individual is substantially limited in a major life activity." See 29 C.F.R. § 1630.2(j)(2). They are: "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2)(i)-(iii), quoted in Bolton, 36 F.3d at 943; see also 29 C.F.R. § 1630.2(j)(3)(ii) (listing three additional factors that "may be considered in determining whether an individual is

14

substantially limited in the major life activity of 'working'"), quoted in Bolton, 36 F.3d at 943.

The regulations further explain that

[t]o demonstrate that an impairment "substantially limits" the major life activity of working, an individual must show "significant[] restrict[ion] in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."

Bolton, 36 F.2d at 942 (quoting 29 C.F.R. § 1630.2(j)(3)(i)). The regulations guide us further in our analysis of whether Mr. MacDonald has shown that Delta regarded his impaired vision as substantially limiting the major life activity of working by defining what is meant by "a class of jobs" or "a broad range of jobs." They define a "class of jobs" from which an individual's impairment restricts him as "[t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." 29 C.F.R. § 1630.2(j)(3)(ii)(B). They define a "broad range of jobs in various classes" from which an individual's impairment has disqualified him as "[t]he job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." 29 C.F.R. § 1630.2(j)(3)(ii)(C). If neither of these definitions is met, and an individual instead shows

15

only that he is unable "to perform a single, particular job," see 29 C.F.R. § 1630.2(j)(3)(i), the regulations and case law make clear that he has not shown that he is "substantial[ly] limit[ed] in the major life activity of working." See id.; see also Bolton, 36 F.2d at 942 (quoting 29 C.F.R. § 1630.2(j)(3)(i)); Dutcher, 53 F.3d at 727 (explaining that "the inability to perform one aspect of a job while retaining the ability to perform the work in general does not amount to substantial limitation of the activity of working."); Wooten, 58 F.3d at 386 (holding that under the ADA, "'working' does not mean working at a particular job of that person's choice.").

Thus, to establish that he has a disability under 42 U.S.C. § 12102(2)(C), Mr. MacDonald must have shown that Delta regarded him as being substantially limited in performing either a class of jobs or a broad range of jobs in various classes. He claims that he has done this because "[a]n airplane mechanic is a class of jobs," see Aplt's Br. at 15, and Delta regarded his impaired vision as significantly restricting his ability to be an airplane mechanic. He relies upon the following evidence in support of this argument: He testified in his deposition that six months before June of 1993, the month in which he was fired, he told Mr. Orges that he "believed that [he] had a cataract which was preventing [him] from performing [his] job as an aircraft mechanic." See Aple's Supp. App., Ex. D at 110. In addition, on May 10, 1993, less than two months before he was terminated, his impaired vision caused him to fail a physical that one must pass in order to be certified to taxi aircraft. See Aplt's App., Ex. D at 85-86.

16

This evidence fails to establish that Mr. MacDonald was disabled under the ADA's definition found in 42 U.S.C. § 12102(2)(C) because it does not show that Delta regarded his vision problems as substantially limiting his ability to be an airplane mechanic. It in no way indicates that Delta treated him as having a substantially limiting impairment. See 29 C.F.R. § 1630.2(l)(1)-(3); Wooten, 58 F.3d at 385. If in fact Mr. MacDonald told Mr. Orges of his vision problems, which Mr. Orges disputes, there is no evidence that Mr. Orges or any other Delta employee treated or regarded Mr. MacDonald differently as a result of this knowledge. In fact, the evidence upon which Mr. MacDonald relies in support of this claim establishes that the only treatment by Delta of him that resulted from his failed eye exam was that Delta did not allow him to taxi aircraft. However, taxiing aircraft is neither "a class of jobs," nor "a broad range of jobs in various classes," but is instead "a single, particular job." See 29 C.F.R. § 1630.2(j)(3)(i). Mr. MacDonald himself admitted in his deposition testimony that "passing the taxi physical wasn't a necessary part of being an aircraft mechanic." See Aple's Supp. App., Ex. D at 111. In fact, Mr. MacDonald had not been certified to taxi aircraft since 1985, see Aplt's App., Ex. H at 199, meaning he had performed the job of airplane mechanic for approximately eight years without taxiing aircraft before he was terminated. Therefore, when Delta disallowed him from taxiing aircraft due to his impaired vision, it did not demonstrate that Delta regarded him as being substantially limited in his ability to perform the major life activity of working.

## 2. Failure to Establish that the Disability Resulted in Termination

Even if Mr. MacDonald's evidence showed that he was disabled under the ADA, which it does not, he has not established the third element of an ADA claim, that he was terminated because of this disability. See White, 45 F.3d at 360-61. He has presented no evidence suggesting that Delta terminated him because it regarded his vision problems as substantially limiting his ability to be an airplane mechanic. There is no evidence that Mr. Orges, who Mr. MacDonald claims knew of his impaired vision, was in any way connected to his termination. There is also no evidence that Mr. MacDonald's failure to pass the eye exam needed to taxi aircraft was related to his eventual termination. We therefore affirm the district court's grant of summary judgment to the defendants on Mr. MacDonald's ADA claim.

## III. CONCLUSION

Because we conclude that Mr. MacDonald has failed to establish a prima facie case under either the ADEA or the ADA, we hold that a reasonable jury could not return a verdict in his favor on either claim. We therefore AFFIRM the district court's grant of summary judgment to the defendants on both claims.

18