**Steven A. MARTIN, Plaintiff,**

v.

**STATE OF KANSAS, Defendant.**

**No. 97–2025–JWL.**

United States District Court, D. Kansas.

Feb. 3, 1998.

Kirk W. Lowry, Palmer & Lowry, Topeka, KS, for plaintiffs.

Lisa A. Mendoza, Kansas Department of Corrections, Edward F. Britton, Jr., Kansas

Dept. of Corrections, Topeka, KS, for defendants.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff Steven A. Martin filed suit against the State of Kansas alleging violations of the Americans with Disabilities Act (ADA) arising out of his employment with the Department of Corrections. This matter is presently before the court on defendant's motion for summary judgment (Doc. # 56).

■ Mr. Martin alleges the State of Kansas discriminated against him on the basis of both an actual disability and a perceived disability in violation of the ADA. He also alleges that two policies of the State violate the ADA. First, Mr. Martin claims that the State's policy of requesting employees to disclose disabilities constitutes an impermissible inquiry under the ADA. Second, Mr. Martin claims that the State's alleged policy of accommodating only temporary disabilities violates the ADA.[1]

Defendant State of Kansas seeks summary judgment on all but one of Mr. Martin's claims.[2] In support of its motion, the State contends the undisputed facts establish the following: (1) Mr. Martin does not have a disability (actual or perceived) within the meaning of the ADA; (2) with or without reasonable accommodation, Mr. Martin was not a "qualified individual"; and (3) no adverse action was taken with respect to Mr. Martin's employment. Finally, the State contends its policy of requesting employees to disclose disabilities was job-related and consistent with business necessity. For the

reasons set forth below, defendant's motion is granted.

### I. Facts[3]

Plaintiff Steven A. Martin began working for the Department of Corrections as a corrections officer assigned to the Lansing Correctional Facility in October 1987.[4] Lansing Correctional Facility is a maximum security adult correctional facility for male felony offenders. Due to the nature of the facility, a corrections officer works under "the threat of assault, murder, escape, fire, riots and/or other disturbances."

According to a written job description, the corrections officer position requires supervising and controlling inmates "which can lead to physical confrontation." The position description also sets forth "special knowledge, skills and abilities" required of corrections officers. Specifically, the position requires the ability to deal effectively with individuals under restraint, the ability to stand for long periods, respond quickly to emergencies, and use force to subdue violent inmates.

Pursuant to established policy, corrections officers rotate to different security post assignments on an annual basis. The purpose of the rotation policy is "to assist security staff in acquiring skills and experience required for promotion through the ranks, to assure equality and fairness of assignments and to prevent or counteract burnout in stressful or monotonous posts." In determining post assignments, several factors are considered, including experience, qualifications, performance, length of service, post preference and consultations with supervisory staff.

---

1. Mr. Martin also alleges in his papers that he seeks relief under the ADA based on a "record" of a substantially limiting impairment. *See* 42 U.S.C. § 12102(2)(B). Mr. Martin did not assert this theory of liability in the pretrial order. Accordingly, any claim based on an alleged "record" of a disability is deemed waived and the court will not address it. *See Tyler v. City of Manhattan,* 118 F.3d 1400, 1403 (10th Cir.1997); *Zinn v. McKune,* 949 F.Supp. 1530, 1534 (D.Kan. 1996).

2. As set forth in section V of the court's order, the State did not address Mr. Martin's claim with respect to the accommodation policy until after

Mr. Martin raised the issue in his response brief. Thus, the court will not address the merits of the claim at this time.

3. In accordance with the applicable summary judgment standard, the facts are uncontroverted or related in the light most favorable to plaintiff.

4. Although not relevant to the court's analysis, Mr. Martin apparently worked for the Department of Corrections as a corrections officer assigned to the Hutchinson Correctional Facility from 1978 through 1981.

Pursuant to the regular post rotation and shift assignment policy, Mr. Martin was assigned to a tower post effective October 16, 1994. The specific responsibilities of this post include, *inter alia,* providing perimeter security, observation into the perimeter, the ability to exercise deadly force to prevent escape, climb stairs, stand, and visually and verbally report alarms. In accordance with the post rotation policy, Mr. Martin was scheduled to remain at this post until October 16, 1995.

The rotation and shift assignment policy also contains a provision regarding disabilities. The provision reads, in pertinent part, as follows:

> Each employee of LCF is requested to complete and submit to the Personnel Department, biannually, a Disclosure of Disability Form.

> Information submitted concerning disabilities or handicaps shall be considered in security post assignments and reasonable accommodations shall be made as necessary.

On February 16, 1995, in light of this policy, Mr. Martin submitted to the State a letter from his physician regarding his "limitations at work." In the letter, Mr. Martin's physician disclosed that Mr. Martin had "degenerative joint arthritis" of the right knee. With respect to Mr. Martin's work restrictions, Dr. Christiano stated:

> He has much difficulty running up and down steps frequently, unable to tolerate any sudden cold temperature (this causes more pain), unable to stand for long periods of time, and is unable to run to alarms.

Dr. Christiano identified Mr. Martin's arthritis as a "permanent, chronic condition."

Upon receipt of this letter, Warden McKune sent a letter to Mr. Martin in which he expressed concern about Mr. Martin's ability to perform the essential functions of the corrections officer position in light of the restrictions set forth in Dr. Christiano's letter. Specifically, Warden McKune stated:

> There are no corrections officer positions at the Lansing Correctional Facility which can accommodate these restrictions on a permanent basis. Therefore, I am attaching a position description for Corrections Officer I. You need to take this position description to your health care provider and obtain an opinion as to which of the duties you can perform.

Warden McKune also asked Mr. Martin to submit a statement from his physician with respect to when Mr. Martin would be able to perform the full range of duties of a corrections officer.[5]

On April 21, 1995, nearly two months later, Dr. Christiano responded to Warden McKune's letter. After reviewing a copy of Mr. Martin's job description, Dr. Christiano set forth the following opinions as to Mr. Martin's abilities:

(1) Can subdue or control violent inmates *only* with assistance;

(2) Can qualify to fire weapons required or to use chemical agents or a baton;

(3) Cannot stand over one hour at a time;

(4) Cannot continuously run up and down stairs;

(5) Cannot run;

(6) I see no problem with tower assignments within the limits as previously described.

Finally, with respect to when Mr. Martin would be able to perform the full range of correctional officer duties, Dr. Christiano simply indicated he would "re-evaluate [Mr. Martin's] knee condition in one year."

On May 3, 1995, Warden McKune again wrote a letter to Mr. Martin in which he proposed to separate Mr. Martin from his employment as a corrections officer because of Dr. Christiano's apparent opinion that Mr. Martin was unable to perform the full range of duties of a corrections officer. In this letter, Warden McKune reiterated to Mr. Martin that there were no corrections officer positions at the Lansing Correctional Facility which could accommodate his restrictions on a permanent basis. Although Warden

---

**5.** It is uncontroverted that the State had a policy of assigning less strenuous duty posts to individuals with temporary physical impairments. Under this policy, such "light duty" assignments were only available on a temporary basis and no permanent assignments were made.

McKune acknowledged Mr. Martin's medical restrictions may not have impacted his ability to perform the duties of his tower assignment, he noted the restrictions impacted Mr. Martin's ability to be assigned "in contact situations." Finally, Warden McKune invited Mr. Martin (or his union representative) to respond to the proposal either in writing or in person.

One week later, Mr. Martin's union representative met with Warden McKune to discuss Mr. Martin's continued employment.[6] After this meeting, Warden McKune decided to postpone any final decision with respect to Mr. Martin's employment until August 17, 1995. According to Warden McKune, the purpose of the extension was to allow Mr. Martin "a full six months in which to provide evidence that [he was] capable of performing the full range of duties of a corrections officer." Moreover, Warden McKune cautioned Mr. Martin that if he was not released to perform the full range of duties of a corrections officer by August 17, 1995, his employment would be terminated. Finally, Warden McKune advised Mr. Martin that he was to continue to perform his regular duties and responsibilities with respect to the tower post.

On May 24, 1995, Mr. Martin filed a charge of discrimination with the EEOC alleging that the State had discriminated against him on the basis of his disability by "initiat[ing] termination proceedings." In the charge, Mr. Martin asserted he suffered from a "permanent, chronic arthritic condition" which prevented him "from running, climbing stairs continuously, and standing for long periods of time." Mr. Martin also maintained he "should be able to remain in a tower indefinately [sic] if needed."

Other than the reference to a permanent tower duty assignment in his EEOC charge, Mr. Martin did not make any request for an accommodation at any time between February 16, 1995 and August 21, 1995. Moreover, Mr. Martin failed to provide the State with any information as to his ability to perform the full range of duties of the corrections officer position. Thus, Warden McKune terminated Mr. Martin's employment on August 21, 1995.

## II. Summary Judgment Standard

When considering a motion for summary judgment, the court must examine all of the evidence in the light most favorable to the nonmoving party. *Jones v. Unisys Corp.*, 54 F.3d 624, 628 (10th Cir.1995). A moving party that also bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anglemyer . v. Hamilton County Hosp.*, 58 F.3d 533, 536 (10th Cir.1995). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* 477 U.S. at 250. Summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed.R.Civ.P. 1).

## III. Disability Discrimination

The ADA prohibits a covered entity from discriminating against a "qualified individual with a disability" because of the individual's disability with respect to terms, conditions, and privileges of employment. *See* 42 U.S.C. § 12112(a). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that

---

**6.** The record is devoid of any details with respect to the substance of this meeting.

such individual holds or desires." 42 U.S.C. § 12111(8); *Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 897 (10th Cir.1997); *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1123 (10th Cir. 1995) (quoting *White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir.1995) (quoting 42 U.S.C. § 12111(8))).

■ Thus, to establish a claim under the ADA, Mr. Martin must demonstrate that: (1) he is disabled within the meaning of the ADA; (2) he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that the State terminated his employment because of his disability. *See Sutton,* 130 F.3d at 897 (citing *Siemon v. AT&T Corp.,* 117 F.3d 1173, 1175 (10th Cir.1997); *White,* 45 F.3d at 360–61); *MacDonald v. Delta Air Lines, Inc.,* 94 F.3d 1437, 1443 (10th Cir. 1996).

The State contends Mr. Martin has failed to establish each of these three elements and, thus, summary judgment is appropriate. As set forth in more detail below, the court believes a genuine issue of material fact exists as to whether Mr. Martin is "disabled" within the meaning of the ADA. Nevertheless, the court finds Mr. Martin is not a "qualified individual" within the meaning of the ADA because he could not perform the essential functions of the corrections officer position with or without reasonable accommodation. Thus, summary judgment in favor of the State on Mr. Martin's discrimination claim is appropriate.[7]

### A. The "Disabled" Requirement

Under the ADA, a "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *Sutton,* 130 F.3d at 897

(quoting 42 U.S.C. § 12102(2)). Mr. Martin relies upon subsections (A) and (C) of § 12102(2) in an effort to establish that he is disabled under the ADA. Specifically, Mr. Martin alleges his degenerative joint arthritis of the knee is a physical impairment that substantially limits several of his major life activities and, alternatively, the State regarded him as having a substantially limiting impairment when it discharged him from employment. The court will address each of Mr. Martin's arguments in turn.

#### 1. Actual Disability

As set forth above, Mr. Martin alleges the State discriminated against him on the basis of an actual disability—degenerative joint arthritis of the right knee. To avail himself of the benefits of the ADA under this theory, Mr. Martin must first demonstrate that his knee impairment "substantially limits one or more of [his] major life activities." *See* 42 U.S.C. § 12102(2)(A).[8]

The ADA does not define either "substantially limits" or "major life activity." According to the regulations implementing the ADA, "major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Sutton,* 130 F.3d at 900 (quoting 29 C.F.R. § 1630.2(i)). *See also MacDonald v. Delta Air Lines, Inc.,* 94 F.3d 1437, 1444 (10th Cir.1996) (adopting definition in 29 C.F.R. § 1630.2(i)). Other activities such as sitting, standing, lifting and reaching may be considered "major life activities." *Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170, 1173 (10th Cir.1996) (citing 29 C.F.R. § 1630.2(i)). In order for an impairment to be considered "substantially limiting," the individual must be

 (i) unable to perform a major life activity that the average person in the general population can perform; or

---

7. The State also contends the employment action at issue, separation without prejudice, does not constitute an adverse employment action. In light of the ruling on the "qualified individual" issue, the court will assume, without deciding, that separation without prejudice constitutes an adverse employment action for purposes of ADA liability and will not analyze the issue.

8. The court will assume, without deciding, that Mr. Martin's knee condition constitutes a "physical impairment" within the meaning of the ADA. *See* 29 C.F.R. § 1630.2(h)(1) (defining "physical impairment"); *Sutton,* 130 F.3d at 898–99 (discussing same).

(ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Sutton,* 130 F.3d at 900 (quoting 29 C.F.R. § 1630.2(j)(1)).

Mr. Martin asserts he is substantially limited in the major life activities of running, walking, standing, bending, crouching, kneeling, crawling and lifting.[9] He also maintains he is substantially limited in the major life activity of working. In support of these contentions, Mr. Martin relies on two expert reports—one submitted by Dr. Christiano and one submitted by a vocational rehabilitation expert, Dick Santner.

Ironically, Mr. Martin's own deposition testimony contradicts these reports. When asked whether his knee condition substantially limited any major life activities, Mr. Martin responded, "Not really." In fact, Mr. Martin specifically denied having any limitation in his ability to walk, stand or work. Moreover, Mr. Martin testified he was willing and able to perform the activities which were restricted by Dr. Christiano.[10]

Essentially, Mr. Martin wants it both ways. He argues that his restrictions "undisputedly" demonstrate he is substantially limited in various major life activities, but argues he is fully capable of performing those activities despite his restrictions. *See Murphy v. United Parcel Serv., Inc.,* 946 F.Supp. 872, 878 (D.Kan.1996) (plaintiff "is trying to have it both ways" by claiming he is disabled due to high blood pressure, but that he can perform the job because it is sufficiently controlled).

Keeping in mind the need to view the evidence in the light most favorable to Mr. Martin, however, the court will assume without analysis that the expert reports create a material fact question as to whether Mr. Martin is "disabled" within the meaning of subsection (A) of 42 U.S.C. § 12102(2).

### 2. "Regarded As" Disabled

■ Mr. Martin also contends the State "regarded" him as having an impairment that substantially limited his major life activity of working because it presumed he could not perform his job based solely on his restrictions. *See* 42 U.S.C. § 12102(2)(C). The State responds that it did not "regard" Mr. Martin as disabled. Rather, it believed Mr. Martin's restrictions rendered him unable to perform the essential functions of one particular job—the corrections officer position. For the reasons set forth below, the court finds Mr. Martin has failed to come forward with sufficient evidence that the State "regarded" him as disabled.

■ The regulations implementing the ADA explain that a person is "regarded as" having an impairment that substantially limits a major life activity if he

(1) has a physical or mental impairment that does not substantially limit major life activities but *is treated* . . . as constituting such limitation;

(2) has a physical or mental impairment that substantially limits major life activities only *as a result of the attitudes* of others toward such impairment; or

(3) has none of the impairments defined [in the regulations] but is treated . . . as having a substantially limiting impairment.

*MacDonald v. Delta Air Lines, Inc.,* 94 F.3d 1437, 1444 (10th Cir.1996) (quoting and adopting 29 C.F.R. § 1630.2(l)(1)–(3)). *See also Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 903 (10th Cir.1997) (same). Thus, " 'a person is "regarded as having" an impairment that substantially limits the person's major life activities when other people treat the person as having a substantially limiting impairment,' regardless of whether

---

**9.** The court expresses no opinion with respect to whether running, bending, crouching, kneeling, or crawling constitute "major life activities."

**10.** For example, Mr. Martin testified that he could subdue or control violent inmates by himself despite Dr. Christiano's restriction that Mr.

Martin could do so only with assistance. Moreover, Mr. Martin testified he was able to stand for more than one hour at a time and was able to run, despite Dr. Christiano's restrictions to the contrary.

the individual actually has an impairment." *Sutton*, 130 F.3d. at 903 (quoting *Mac-Donald*, 94 F.3d at 1444 (quoting *Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir. 1995))). In essence, the "focus is on the impairment's or the perceived impairment's effect upon the attitudes of others." *Id.*

■ In order to establish a "disability" under the "regarded as" prong of the ADA with respect to the major life activity of working, Mr. Martin must establish that the State regarded him as substantially limited in his ability to perform either a class of jobs or a broad range of jobs. *Sutton*, 130 F.3d at 904; *MacDonald*, 94 F.3d at 1445. A "class of jobs" is defined as "[t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." *Sutton*, 130 F.3d at 904 (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(B)); *Siemon v. AT&T Corp.*, 117 F.3d 1173, 1176 (10th Cir.1997) (quoting same); *MacDonald*, 94 F.3d at 1444–45 (same). A "broad range of jobs in various classes" is defined as "[t]he job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." *Sutton*, 130 F.3d at 904 (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(C)); *Siemon*, 117 F.3d at 1176 (quoting same). *See also MacDonald*, 94 F.3d at 1445 ("If neither of these definitions is met, and an individual instead shows only that he is unable 'to perform a single, particular job,' the regulations and case law make clear that he has not shown that he is 'substantial[ly] limit[ed]' in the major life activity of working.'") (citations omitted).

■ Mr. Martin cannot make this showing. In fact, Mr. Martin wholly fails to allege the State regarded him as substantially limited in his ability to perform a class of jobs or a broad range of jobs. Rather, Mr. Martin merely alleges the State regarded him as disabled because it required him to prove he was able to perform the job duties

of the corrections officer position—a single, particular job. According to the Tenth Circuit, "[a]n employer does not necessarily regard an employee as substantially limited in the major life activity of working simply because it believes that individual is incapable of performing a particular job." *Sutton*, 130 F.3d at 904.

Viewing the evidence in the light most favorable to Mr. Martin, he can establish only that the State regarded him as unable to perform the functions of the corrections officer position—a single, particular job. This evidence fails to establish that Mr. Martin was disabled under the "regarded as" definition found at 42 U.S.C. § 12102(2)(C). *See Sutton*, 130 F.3d at 905 (rejecting "regarded as" claim where uncorrected vision only prevented plaintiffs from working as pilots for United—a single, particular job); *Mac-Donald*, 94 F.3d at 1445 (rejecting "regarded as" claim because "taxiing aircraft is neither 'a class of jobs' nor 'a broad range of jobs in various classes,' but is instead 'a single particular job'"); *Daley v. Koch*, 892 F.2d 212, 215 (2d Cir.1989) ("Being declared unsuitable for the particular position of police officer is not a substantial limitation of a major life activity."), *cited with approval in Sutton*, 130 F.3d at 905. *See also Welsh v. City of Tulsa*, 977 F.2d 1415, 1419 (10th Cir.1992) ("an impairment that an employer perceives as limiting an individual's ability to perform only one job [firefighter] is not a handicap"). Thus, the State's motion for summary judgment is granted with respect to Mr. Martin's "regarded as" claim.

### B. A "Qualified Individual"

■ The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 897 (10th Cir.1997); *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1123 (10th Cir. 1995) (quoting *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995) (quoting 42 U.S.C. § 12111(8))). The Tenth Circuit has adopted a two-tiered analysis for determining

whether a person is "qualified" under the ADA:

> First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

*Milton,* 53 F.3d at 1123 (quoting *White,* 45 F.3d at 361–62 (quoting *Chandler v. City of Dallas,* 2 F.3d 1385, 1393–94 (5th Cir.1993))).

The State contends Mr. Martin is not a "qualified individual" within the meaning of the ADA because (1) he could not perform the essential functions of the corrections officer position; and (2) he could not be reasonably accommodated.[11] Mr. Martin contends that he could perform the essential functions of his position and further contends the State could accommodate him by allowing him to remain on tower duty indefinitely.[12] For the reasons set forth below, the court finds Mr. Martin is not a "qualified individual" within the meaning of the ADA. The State's motion for summary judgment is granted with respect to Mr. Martin's discrimination claim.

### 1. Essential Functions

According to the State, the essential functions of the corrections officer position include, *inter alia,* the ability to stand for long periods of time, walk, run, climb stairs, work in inclement weather, physically restrain persons in custody and respond to emergencies. Moreover, the State contends the ability to be assigned to any post within the facility due to operational needs and availability for annual rotation are essential functions of the corrections officer position.

According to Mr. Martin, however, the essential functions of the corrections officer position depend upon the officer's particular post assignment. Thus, Mr. Martin contends the essential functions of his position (i.e., the tower post) include, *inter alia,* providing perimeter security, observation into the perimeter, the ability to exercise deadly force to prevent escape, climb stairs, stand and visually and verbally report alarms. Mr. Martin contends he was able to perform these job functions.[13]

Clearly, the parties disagree with respect to which functions constitute the "es-

---

**11.** The State also argues that Mr. Martin should be estopped from claiming he is a "qualified individual" with a disability in that he has applied for disability benefits from the Ford Life Insurance Company and the Kansas Public Employees Retirement System and, in so applying, allegedly represented he was "totally disabled."

The Tenth Circuit has not yet had the opportunity to address this "judicial estoppel" argument in the ADA context. Although this court has never fully addressed the argument, it has recognized the potential viability of such an argument. *See Ricks v. Xerox Corp.,* 877 F.Supp. 1468, 1477 n. 9 (D.Kan.1995) ("Absent evidence that plaintiff misrepresented his condition in his pursuit of long-term disability benefits, he is arguably estopped from now claiming he was in fact a qualified individual.").

In light of the court's ruling on the "qualified individual" issue, however, the court declines to address the State's judicial estoppel argument under these facts. According to Mr. Martin, he completed the forms without the assistance of counsel and never received any benefits under the policies. *Cf. Garcia–Paz v. Swift Textiles, Inc.,* 873 F.Supp. 547, 555–57 (D.Kan.1995) (plaintiff was held estopped from claiming that

she was a "qualified individual" where plaintiff, her counsel, and her physician consistently represented that she was entitled to long-term disability benefits because she could not perform the material duties of her job and plaintiff collected benefits based on the unambiguous, informed representations).

**12.** Although Mr. Martin vigorously argues that he never requested any type of accommodation, he asserted both in his EEOC charge and his papers that the State should have allowed him to remain on his post assignment (tower duty) indefinitely. Moreover, Dr. Christiano's restrictions suggest that Mr. Martin be placed on tower duty indefinitely. The court interprets this suggestion as a request for an accommodation.

**13.** It is unclear whether Mr. Martin claims he could perform the essential functions of the corrections officer position as cited by the State or only the specific duties of the specific post assignment which he held. The distinction, however, is irrelevant in light of the court's ruling that Mr. Martin must be able to perform the essential functions of the corrections officer position, not just those duties of a particular post.

sential" functions of the corrections officer position. The regulations implementing the ADA define essential functions as "those functions that the individual who holds the position must be able to perform unaided or with the assistance of a reasonable accommodation." *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir.1995) (quoting 29 C.F.R. § 1630 app. § 1630.2(n)). In determining whether a job function is essential, the initial inquiry

> is whether an employer actually requires all employees in the particular position to perform the allegedly essential function. An employer's judgment is also relevant evidence to be considered, as are the terms of any collective bargaining agreement. This inquiry is not intended to second guess the employer or to require him or her to lower company standards.

*Id.* (citing 29 C.F.R. § 1630 app. § 1630.2(n)). The Tenth Circuit has also acknowledged that "[t]he ADA does not limit an employer's ability to establish or change the content, nature, or functions of a job. It is the employer's province to establish what a job is and what functions are required to perform it." *Id.* (quoting EEOC Technical Assistance Manual at II–18 (1992)).

 There is sufficient evidence in the record to support the State's position that the essential functions of the corrections officer position encompassed more than the duties of the particular post assignment. Moreover, Mr. Martin has presented no evidence to rebut this conclusion other than his own subjective belief that the essential functions of the position were limited to those duties of the post assignment.[14] Finally, Mr. Martin has offered no evidence to suggest that the functions viewed by the State as essential were not actually required of each corrections officer. Thus, the court accepts the State's position as to which functions of the corrections officer position are essential.

 Having defined the essential functions of the corrections officer position, the court must now determine whether Mr. Martin was able to perform those functions. The State maintains that Mr. Martin was not able to perform the essential functions of the corrections officer position based on Dr. Christiano's restrictions. Mr. Martin, on the other hand, urges he was able to perform the essential functions of the position despite his medical restrictions.[15]

The record does not support Mr. Martin's claim. Mr. Martin has failed to come forward with sufficient evidence that he was able to perform the essential functions of the corrections officer position despite his restrictions. In fact, Mr. Martin's own experts insist his medical restrictions were such that he was substantially limited in a variety of major life activities—including his ability to work. Again, Mr. Martin is trying to have it both ways by relying on his restrictions to prove his "disability" yet proclaiming his "ability" to perform the essential functions of his job despite the restrictions.

 Moreover, despite Mr. Martin's contention to the contrary, the State was justified in relying on Dr. Christiano's restrictions and questioning Mr. Martin's ability to perform the essential functions of the corrections officer position. *See Burnett v. Western Resources, Inc.*, 929 F.Supp. 1349, 1357 (D.Kan.1996) ("As the regulations indicate, employers are obligated to inquire

---

14. In support of his argument, Mr. Martin also points to the expert report of Dick Santner, a vocational rehabilitation expert retained by Mr. Martin. Mr. Santner notes that the "actual job description" for Mr. Martin "appears to be," *inter alia*, providing surveillance from the tower, verbally reporting alarms and observing traffic activity through the gate. Mr. Santner cites no authority for his statement, however.

Mr. Martin also alleges that the testimony of Major Friesz, a witness for the State, supports his position. The court is not persuaded. Although Major Friesz recognized the "basic duties" of the tower post included providing pe-

rimeter security, observation and the ability to exercise deadly force if necessary to prevent escape, he testified that the "essential functions" of the corrections officer position included those functions enumerated by the State.

15. Throughout his papers, Mr. Martin makes reference to his eleven years of satisfactory performance as a corrections officer apparently in an effort to demonstrate he is qualified for the position. Mr. Martin's past performance as a corrections officer is irrelevant to his present ability to perform his job in light of his medical restrictions.

about physical limitations of which they become aware . . . ."). Moreover, the State's knowledge of Mr. Martin's medical restrictions were sufficient to permit the State to commence the reasonable accommodation process. *Id.*

### 2. Reasonable Accommodation

Having determined Mr. Martin could not perform the essential functions of the job, the court must now determine whether any reasonable accommodation would enable him to perform those functions. In light of Mr. Martin's specific medical restrictions, the State contends that accommodation was not possible. According to the State, each corrections officer must be able to run, stand for long periods of time, be available for rotation, physically control inmates if necessary and respond quickly to emergencies. Dr. Christiano's medical restrictions prevented Mr. Martin from performing these activities.

Mr. Martin, on the other hand, maintains that he was able to perform the functions of his particular post assignment and, thus, the State should have allowed him to remain in his post assignment (tower duty) indefinitely.[16] The State views Mr. Martin's request for indefinite tower duty as a request for a permanent light duty assignment. According to the State, such a request is neither reasonable nor required under the ADA.[17] The court agrees and finds Mr. Martin's argument flawed in two respects.

First, the Tenth Circuit has recognized that "[a]n employer is not required by the ADA to reallocate job duties in order to change the essential functions of a job." *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir.1995) (citing 29 C.F.R. § 1630 app. § 1630.2(*o*)). Moreover, an accommodation that would result in other employees having to work harder is not required. *Id.* (citing 29 C.F.R. § 1630.2(p)(2)(v) (impact to other employees is a relevant factor in determining the reasonableness of an accommodation)).

The court does not believe the State is required to permanently assign Mr. Martin to a "light duty" post simply because he cannot otherwise perform the essential functions of his position. *Id.* (suggested accommodation of designating lighter work for plaintiffs held not reasonable where such accommodation would "fundamentally alter the nature of defendant's warehouse operation, a change not demanded by the law."). Moreover, it is uncontroverted the State's light duty policy expressly prohibited permanent assignments. *See Nguyen v. IBP, Inc.*, 905 F.Supp. 1471, 1485–86 (D.Kan.1995) (permanent assignment to light duty position not a reasonable accommodation under ADA where employer treated such positions as temporary).

Second, the suggested accommodation is not one which would allow Mr. Martin to perform the essential functions of the corrections officer position. Even assuming Mr. Martin could stay in the tower post permanently, his medical restrictions still preclude him from performing the essential functions of the corrections officer position, including running, standing for long periods of time, responding to alarms and physically restraining inmates without assistance if necessary. As set forth above, the ability to perform the duties of a particular post does not negate the requirement that an employee perform the essential functions of the corrections officer position.[18]

In short, the court does not consider assignment to permanent tower duty a reason-

---

**16.** According to Mr. Martin, he should have been able to remain in his post assignment based on his seniority. The evidence in the record is insufficient to support this argument. In any event, this argument is irrelevant in light of the court's ruling that Mr. Martin must be able to perform the essential functions of the corrections officer position, not just those duties of a particular post.

**17.** The State has a policy of accommodating corrections officers with temporary disabilities by assigning such individuals to certain "light duty"

posts. Tower posts are among the posts typically used to accommodate corrections officers with temporary disabilities. The policy expressly states that such assignments will not be made on a permanent basis.

**18.** It is undisputed that permanent "light duty" assignments were not available under the State's policy and Mr. Martin has failed to come forward with any evidence that other corrections officers were ever assigned permanent post assignments.

able accommodation under the ADA. Mr. Martin has offered no other alternatives. *See Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 897 (10th Cir.1997) (plaintiff must describe the reasonable accommodation in demonstrating he or she is qualified to perform the essential functions of a position). Thus, the court finds Mr. Martin is not a "qualified individual" within the meaning of the ADA because he could not perform the essential functions of the corrections officer position and no accommodation was possible. The State is entitled to summary judgment on plaintiff's ADA discrimination claim.

## IV. Challenged Medical Inquiry

The ADA's prohibition against discrimination includes medical inquiries and examinations. 42 U.S.C. § 12112(d)(1); *Schnake v. Johnson County Comm. College,* 961 F.Supp. 1478, 1481 (D.Kan.1997). With respect to medical inquiries and examinations, the ADA sets forth different rules for pre-offer job applications (§ 12112(d)(2)); post-offer preemployment examinations (§ 12112(d)(3)); and inquiries of current employees (§ 12112(d)(4)). *Roe v. Cheyenne Mountain Conference Resort,* 920 F.Supp. 1153, 1154 (D.Colo.1996), *rev'd on other grounds,* 124 F.3d 1221 (10th Cir.1997). Because the challenged inquiry in this case applies to current employees, the court will analyze the inquiry under § 12112(d)(4). *See id.* (analyzing claim of current employee with respect to prescription drug disclosure policy under § 12112(d)(4)).

Section 12112(d)(4) of the ADA prohibits employers from making inquiries of an employee as to whether he or she is an "individual with a disability or as to the nature or severity of the disability unless such ... inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4); *Cheyenne Mountain Conference Resort,* 920 F.Supp. at 1154. According to the regulations, the "purpose of this provision is to prevent ... inquiries that do not serve a legitimate business purpose." 29 C.F.R. § 1630 app. § 1630.13(b).

An employer may, however, make "inquiries into the ability of an employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B). The regulations instruct that this provision "permits employers to make inquiries ... when there is a need to determine whether an employee is still able to perform the essential functions of his or her job" and "permits employers ... to make inquiries ... necessary to the reasonable accommodation process described in this part." 29 C.F.R. § 1630 app. § 1630.14(c).

 With this statutory and regulatory framework in mind, the court turns to Mr. Martin's claim that the State's disability disclosure policy constitutes an impermissible inquiry under the ADA. In support of his claim, Mr. Martin first highlights an article published in the employee newsletter in April of 1992. The article, apparently entitled "Disclosure of Disability," reads as follows:

In April, the facility distributes the disclosure of disability forms to enable employees the opportunity to make an updated disclosure. The completion of these forms is voluntary and does not reflect on your employment with the Lansing Correctional Facility. The disclosure of disability is helpful when we are identifying jobs which individuals with specific disabilities can perform, and in particular, if you make a request for reasonable accommodation under the Kansas Act Against Discrimination or the Americans with Disabilities Act. You may obtain a disclosure of disability form at any time at our personnel office.

Mr. Martin also relies on an order issued by the facility with respect to post rotation and shift assignments. One paragraph of the order is entitled "Provisions for Disability or Handicap" and reads as follows:

(A) Each employee of LCF is requested to complete and submit to the personnel department, biannually, a disclosure of disability form.

(B) Information submitted concerning disabilities or handicaps shall be considered in security post assignments and reasonable accommodation shall be made if necessary.

(C) Officers requesting accommodation of a disability or a handicap shall submit a statement from the attending physician which specifies the officer's capa-

bility and limitation prior to each post rotation date to the major with a copy to the Human Resources manager.

Finally, Mr. Martin contends the disability disclosure form itself requests the employee to disclose both the disability and the nature and severity of the disability. According to the State, the purpose of the policy is to determine the employee's ability to perform the essential job functions of his or her position and to provide reasonable accommodations as necessary; thus, the policy is job-related and consistent with business necessity.

The Tenth Circuit has had a limited opportunity to address the medical inquiry provisions of § 12112(d)(4). *See Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1230–31 (10th Cir.1997). In *Cheyenne Mountain Conference Resort*, the challenged policy required, as a condition of employment, that employees report "without qualification" all drugs present within their system. *Id.* at 1226. The policy further provided that "prescribed drugs may be used only to the extent that they have been reported and are approved by an employee supervisor." *Id.*

Although the district court recognized "[s]uch a provision would be permissible if the Resort could demonstrate that its prescription medication inquiry [was] 'job-related and consistent with business necessity,'" the court found the Resort wholly failed to make any such showing. *Roe v. Cheyenne Mountain Conference Resort*, 920 F.Supp. 1153, 1155 (D.Colo.1996).[19] Thus, the court determined that the policy constituted a "disability-related inquiry" and granted summary judgment in favor of the plaintiff on her medical inquiry claim. *Id.* The Tenth Circuit expressly agreed with the district court's determination that the prescription drug disclosure provision of the policy violated the ADA. *Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d at 1230–31.[20]

The challenged policy here is easily distinguished from the policy at issue in *Cheyenne Mountain Conference Resort*. First, it is undisputed that completion of a disclosure form is wholly voluntary rather than a condition of employment. Second, contrary to Mr. Martin's belief, the specific information requested does not require an employee to disclose the specific disability, any specific symptoms or conditions of his or her disability, or any information about the nature or severity of his or her disability. The disclosure form simply instructs employees to place an "X" after any "disability" which presents a "substantial barrier to [the employee's] employment opportunities." The employee can choose from among six broad categories of "disabilities"—visual, hearing, speech, physical, learning and "other." No other information is sought.[21]

Finally, and most importantly, the language of the policy itself indicates that the disclosure forms are used in identifying positions which the employee can perform and in assessing the need for reasonable accommodation. *See* 42 U.S.C. § 12112(d)(4)(B) (An employer may make "inquiries into the ability of an employee to perform job-related functions."). This language is consistent with the State's argument that the policy is job-related and consistent with business necessity. *See* 42 U.S.C. § 12112(d)(4). Moreover, Mr. Martin has not offered any evidence to suggest the policy does not serve a legitimate business purpose.

---

**19.** In fact, the Resort argued that it did not have to demonstrate the provision at issue was job-related and consistent with business necessity because the "job-related" requirement applied only to medical examinations. *Cheyenne Mountain Conference Resort*, 920 F.Supp. at 1155. The court, citing the plain language of the statute, rejected this argument. *Id.*

**20.** After the district court granted summary judgment in favor of the plaintiff, the plaintiff sought an injunction against enforcement of the prescription drug disclosure provisions. *Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d at 1227. The district court refused to enjoin the Resort because he was "confident" that the Resort would amend its policy to conform to the court's order. *Id.* The plaintiff appealed this ruling and it is in this context that the Tenth Circuit addressed the policy. *Id.*

**21.** The form also instructs employees, before completing the form, to "be sure that you have read and understand the information on the reverse side of this form." Mr. Martin has not included a copy of the reverse side of the form in the record. Thus, the court must address this claim without analyzing the form in its entirety.

In light of the specific language of the policy, coupled with Mr. Martin's failure to rebut the State's rationale for the policy, the court finds the disability disclosure policy does not violate § 12112(d)(4) of the ADA. The State's motion for summary judgment with respect to this claim is granted.

## V. Accommodation Policy

The State also claims Mr. Martin has failed to adduce sufficient evidence that the State's alleged policy of refusing to accommodate permanent disabilities violates the ADA. The court does not address the merits of this issue because the State did not advance it in its memorandum in support of summary judgment. Rather, the State raised the issue for the first time in its reply brief, after Mr. Martin pointed out in his response brief that the State had *not* raised the issue.

District of Kansas Rule 7.1(b) governs motion practice in this court. The rule permits parties to file a dispositive motion, a response to the motion, and a reply by the movant. *Thurston v. Page,* 931 F.Supp. 765, 768 (D.Kan.1996). Courts in this district have been reluctant to consider issues raised for the first time in a reply brief. *See Thurston,* 931 F.Supp. at 768 ("The court will not consider the new argument . . . presented in defendant's reply brief when that issue was not raised in the initial motion for summary judgment.") (citing *Glad v. Thomas County Nat'l Bank,* No. 87–1299–C, 1990 WL 171068 (D.Kan. Oct.10, 1990) (court will not consider new arguments and issues presented in a reply brief because plaintiff has not had an opportunity to respond)); *Mike v. Dymon, Inc.,* No. 95–2405–EEO, 1996 WL 427761, at *2 (D.Kan. July 25, 1996) ("In pursuit of fairness and proper notice, the court generally summarily denies or excludes all arguments and issues first raised in reply briefs.") (internal quotations omitted) (quoting *Wagher v. Guy's Foods, Inc.,* 765 F.Supp. 667, 671 (D.Kan.1991)).

■ The court will not address the accommodation policy issue here because it does not believe Mr. Martin has had a fair opportunity either to direct the court to evidence supporting his claim that the State's alleged policy of refusing to accommodate permanent disabilities violates the ADA or to present his legal arguments along those lines. This case is somewhat different from the cases cited above because the State did not technically raise the issue for the first time in its reply brief; Mr. Martin made reference to the issue in its response brief. Nevertheless, Mr. Martin had no opportunity to present evidence or argue the merits of the issue. Under the circumstances in this case, the court does not believe Mr. Martin should be penalized for merely attempting to clarify which issues are *not* properly before the court.

The court believes, however, that this issue should be addressed prior to trial. Thus, the court will permit Mr. Martin to file a surreply to the State's reply brief no later than February 16, 1998 in which he can fully address the State's arguments with respect to the alleged policy. The court will then determine whether summary judgment should be granted on this claim or whether a trial will be necessary. This case will be placed at the foot of the March trial calendar and will not be called for trial before March 10, 1998, in any event, should a trial be necessary on this one remaining issue in the case.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (Doc. # 56) is granted with respect to plaintiff's claim of disability discrimination and impermissible medical inquiry. It is further ordered that plaintiff shall file a surreply on the issue of the accommodation policy on or before February 16, 1998.

**IT IS SO ORDERED.**